Slip Op. 13-142

UNITED STATES COURT OF INTERNATIONAL TRADE

BLUE FIELD (SICHUAN) FOOD
INDUSTRIAL CO., LTD.,

                                   Plaintiff,

v.

UNITED STATES,

                                   Defendant,

and

MONTEREY MUSHROOMS, INC.,

                                   Defendant-Intervenor.

Before: Richard W. Goldberg, Senior Judge
Court No. 12-00320

**PUBLIC VERSION**

### OPINION AND ORDER

[The court remands the Department of Commerce's final results of an administrative review of an antidumping duty order on preserved mushrooms from the People's Republic of China.]

Dated: November 14, 2013

*Ronald M. Wisla* and *Lizbeth R. Levinson*, Kutak Rock LLP, of Washington, DC, for plaintiff.

*Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Devin S. Sikes*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Michael J. Coursey* and *John M. Herrmann*, Kelley Drye & Warren LLP, of Washington, DC, for defendant-intervenor.

Goldberg, Senior Judge: Plaintiff Blue Field (Sichuan) Food Industrial Co., Ltd. ("Blue

Field") contests a final determination of the Department of Commerce ("Commerce") in the

twelfth periodic administrative review of an antidumping duty order on preserved mushrooms

from the People's Republic of China. Compl. ¶ 1, ECF No. 5; *Certain Preserved Mushrooms*

*from the People's Republic of China*, 77 Fed. Reg. 55,808 (Dep't Commerce Sept. 11, 2012)

(final admin. review) ("Final Results"). In the review, Commerce assigned Blue Field a 308.33%

dumping margin, increased from 2.17% in the eleventh review. Final Results at 55,809; *see also*

*Certain Preserved Mushrooms from the People's Republic of China*, 76 Fed. Reg. 70,112,

70,113 (Dep't Commerce Nov. 10, 2011) (amended final admin. review).

In this appeal, Blue Field claims Commerce failed to ground its dumping margin in

substantial evidence. More specifically, Blue Field argues Commerce selected aberrational

surrogate values for rice straw and cow manure, two inputs in Blue Field's mushroom

cultivation. The court is asked to remand the action to Commerce to reconsider the contested

surrogate values and recalculate the dumping margin. Compl. 5.

The facts of the case are dense and technical. To guide the reader through the

administrative jungle, the court divides its analysis into four parts. In Part I, the court explains

Commerce's antidumping review procedures for products from nonmarket economies. The court

also lists key events that occurred during the twelfth administrative review and summarizes

relevant record data. In Part II, the court decides whether Blue Field exhausted its administrative

remedies respecting a number of arguments made on appeal. In Part III, the court determines

whether Commerce grounded its surrogate values for rice straw and cow manure in substantial

evidence. The court provides remand orders in Part IV. Section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c) (2006),[1] gives the court jurisdiction to hear the case.

## I.      BACKGROUND

Blue Field exports preserved mushrooms of the species *Agaricus bisporus* and *Agaricus*

*bitorquis*, known otherwise as common table mushrooms. Final Results, 77 Fed. Reg. at 55,809.

Since 1999, an antidumping order has covered these wares whether imported whole, sliced,

diced, or as stems and pieces. *Certain Preserved Mushrooms from the People's Republic of*

*China*, 64 Fed. Reg. 8308 (Dep't Commerce Feb. 19, 1999) (antidumping duty order). This case

concerns an administrative review Commerce conducted for subject merchandise exported

between February 1, 2010 and January 31, 2011 (the "period of review"). *See* Final Results, 77

Fed. Reg. at 55,808.

### A.  The Administrative Review Process for Nonmarket Economy Goods

To calculate antidumping duty rates, Commerce applies the arithmetic outlined in Section

731 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673 (2006).[2] Under the statute,

Commerce subtracts a foreign product's "export price" (the product's price in the United States)

or "constructed export price" from its "normal value" (the product's price or value in the

producer's home country). The difference between these two values is the dumping margin

Commerce assigns the product. 19 U.S.C. § 1677(35)(A); *see also Mittal Steel Galati S.A. v.*

*United States*, 31 CIT 1121, 1122–23, 502 F. Supp. 2d 1295, 1297 (2007).[3]

---

[1] Further citations to the Customs Courts Act of 1980 are to the relevant portions of Title 28 of the U.S. Code, 2006 edition.

[2] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2006 edition.

[3] The calculation can be very complicated when there are below-cost sales, multiple models, and some sales above rather than below normal value. These problems do not arise in this case.

The calculus grows considerably more complicated, however, when Commerce determines dumping margins for goods made in nonmarket economies. Goods produced in *market* economies usually carry a "normal value" equal to the goods' sale price in the country of manufacture. 19 U.S.C. § 1677b(a). The law tacitly assumes these prices are set by market forces of supply and demand. In *nonmarket* economies, however, product prices are determined not solely by consumer tastes, but presumably by some government action. Hence, to determine the normal value of nonmarket economy goods for use in comparison to prices in the United States, Commerce disregards sales prices and estimates the market economy value of the nonmarket good's factors of production (or "inputs"). It then adds up those values, includes an amount to represent general expenses, profit, and other expenses, and adopts the sum as the good's constructed normal value. *See id.* § 1677b(c). The prices assigned to the inputs are called "surrogate values."

When calculating surrogate values, Commerce first gathers production and sales data from the parties to an administrative review. *See* 19 C.F.R. § 351.221 (2013). Commerce then selects surrogates from among data meeting certain statutory requirements: To the extent possible, surrogate values must (1) come from a market economy country that is (2) a significant producer of the subject good and (3) economically comparable to the foreign producer's country. *See* 19 U.S.C. § 1677b(c)(4). Commerce's chosen surrogate must also constitute "the best available information" on the record regarding input prices. *Id.* § 1677b(c)(1).[4] In other words,

---

[4] Commerce employs certain nonbinding preferences when choosing the "best available information" to value inputs. In general, Commerce tries to select surrogate values that are: product-specific, representative of a broad market average, publicly available, contemporaneous with the period of review, free of taxes and duties, and from an approved surrogate country. *Certain Preserved Mushrooms from the People's Republic of China*, 77 Fed. Reg. 13,264, 13,268 (Dep't Commerce Mar. 6, 2012) (prelim. results); *see also* 19 C.F.R. § 351.408(c)(2) ("[T]he Secretary normally will value all factors in a single surrogate country.").

the surrogates must be suitable to yield accurate dumping margins. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

Commerce may also review "benchmark" data to ensure the surrogate values it selects are reasonable. A benchmark is a product whose price roughly correlates with the price of an input assigned a surrogate value. Unlike surrogate values, however, benchmarks need not reflect the actual price of the inputs into foreign merchandise. Furthermore, benchmark data need not come from an economy comparable to the foreign producer's. *See Peer Bearing Co.-Changshan v. United States*, 35 CIT __, __, 752 F. Supp. 2d 1353, 1372 (2011). Benchmarks, of course, become less informative the greater the difference in the levels of development of the countries from which the data derive. *See, e.g.*, *Anshan Iron & Steel Co. v. United States*, 27 CIT 1234, 1248 (2003). In sum, Commerce may use benchmark data if these data prove helpful in determining whether a surrogate value is aberrational, or, to quote the statute, not "the best available information" for valuing an input. *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Grp. Co. v. United States*, 32 CIT 673, 681 (2008).

After combing through the parties' proposed surrogates and benchmarks, Commerce decides which data to use to value the exporter's inputs. Then it adds the surrogate values of all the inputs into the subject good, including costs, and produces the good's constructed normal value. Commerce next publishes its findings in preliminary results, to which parties respond in case briefs and rebuttals. 19 C.F.R. §§ 351.221 (review procedures), 351.309 (written argument). Final dumping margins issue after the record closes to additional arguments and information. *See id.* § 351.221.

**B.  The Twelfth Administrative Review of the 1999 Antidumping Order**

Following the pattern above, Commerce requested information from foreign and

domestic producers during the twelfth administrative review. *See Initiation of Antidumping Duty*

*Administrative Reviews*, 76 Fed. Reg. 17,825 (Dep't Commerce Mar. 31, 2011). In May 2011,

Commerce selected Blue Field as a mandatory respondent. Respondent Selection Memorandum,

PD I 23 (May 18, 2011), ECF No. 18 (Nov. 20, 2012). Blue Field, in turn, produced U.S. sales

data and other information. Blue Field Questionnaire Response, PD I 44 (July 6, 2011), ECF No.

18 (Nov. 20, 2012) ("PD I 44").

The following January, Monterey Mushrooms, Inc., a domestic producer and "interested

party" under 19 U.S.C. § 1677(9), proposed surrogate prices for Blue Field's straw and manure

inputs. Petitioner's Surrogate Comments at Exs. 3, 5, PD II 24 at bar code 3049889-01 (Jan. 6,

2012), ECF No. 18 (Nov. 20, 2012) ("PD II 24"). Monterey Mushrooms based its proposed

surrogates on Colombian import prices listed in the Global Trade Atlas ("GTA"). The GTA

valued cereal husk and fertilizer—each a substitute for rice straw or cow manure—at $1350.88

and $1337.94 per metric ton, respectively. *See id.* (prices in Colombian pesos); Pl.'s Reply Br.

8–9, ECF No. 36 (prices in U.S. dollars). Blue Field responded by proposing alternative

surrogate values in two rebuttal submissions. Blue Field's Rebuttal Surrogate Comments at Ex.

1, PD II 35 at bar code 3051313-01 (Jan. 17, 2012), ECF No. 18 (Nov. 20, 2012) ("PD II 35");

Blue Field's Rebuttal Surrogate Comments at Ex. 1, PD II 43 at bar code 3059154-01 (Feb. 24,

2012), ECF No. 18 (Nov. 20, 2012) ("PD II 43"). It argued that Monterey Mushrooms' data were

inferior to Blue Field's proposed surrogates, which provided prices specific to rice straw and

cow manure. *See* PD II 43 at 3.

Notwithstanding Blue Field's efforts, Commerce adopted Monterey Mushrooms'

Colombian surrogates in its preliminary results. *See Certain Preserved Mushrooms from the*

*People's Republic of China*, 77 Fed. Reg. 13,264, 13,268 (Dep't Commerce Mar. 6, 2012)

(prelim. results) ("Preliminary Results"). A flurry of statistics, letters, and arguments followed.

On April 9, 2012, Blue Field submitted nearly three-hundred pages of surrogate and benchmark

information to prove Commerce's surrogate values were aberrantly high. Blue Field's Surrogate

Data, PD II 55–57 at bar code 3068251-01 to -03 (Apr. 9, 2012), ECF No. 18 (Nov. 20, 2012)

("PD II 55–57"). The parties then turned in their case briefs and rebuttals. In its case brief, Blue

Field asked Commerce to use its alternative Indian or Indonesian surrogates in light of

irregularities in the Colombian data.[5] Blue Field's Case Brief at 7–14, PD II 58 at bar code

3070213-01 (Apr. 19, 2012), ECF No. 18 (Nov. 20, 2012) ("PD II 58"). Monterey Mushrooms,

in turn, discredited Blue Field's benchmarks and proposed new benchmarks to corroborate the

Colombian surrogates.[6] Petitioner's Rebuttal Surrogate Submission, PD II 60 at bar code

3070232-01 (Apr. 19, 2012), ECF No. 18 (Nov. 20, 2012) ("PD II 60"). Blue Field then

countered by asking Commerce to reject Monterey Mushrooms' benchmarks under 19 C.F.R.

§ 351.301(c)(1), which permits Commerce to refuse untimely filed data. Blue Field's Rebuttal

Brief at 1–2, PD II 61 at bar code 3071202-01 (Apr. 24, 2012), ECF No. 18 (Nov. 20, 2012)

("PD II 61"). Monterey Mushrooms responded by attacking Blue Field's benchmarks and

---

[5] Blue Field specifically referenced the following data in its case brief: a 2007 Indonesian USAID report, U.S. cereal straw import data, a USDA national report on cereal products, U.S. commercial feed yard manure prices, an Internet offer for manure, a 1999 Colombian organic fertilizer study, 2004 data on chicken manure from the Philippines, 2005–2006 Indian data on cow manure, 2006–2007 Indian data on rice straw, and a U.N. Food and Agriculture Organization ("FAO") study mentioning Indian manure. *See* PD II 58.

[6] Monterey Mushrooms' benchmarks comprised import data under Harmonized Tariff Schedule ("HTS") 1213.00 (cereal products) and 3101.00 (fertilizer) from Indonesia, the Philippines, South Africa, Thailand, and Ukraine.

alternative surrogates. Petitioner's Rebuttal Brief at 6–18, PD II 62 at bar code 3071538-01 (Apr. 24, 2012), ECF No. 18 (Nov. 20, 2012) ("PD II 62").

On September 11, 2012, Commerce published its Final Results. Final Results, 77 Fed. Reg. at 55,808. In the accompanying Issues and Decisions Memorandum ("I&D Memo"), Commerce explained that it used Monterey Mushrooms' Colombian surrogates to value Blue Field's straw and manure inputs. Commerce also credited Monterey Mushrooms' benchmark data, rejected a number of Blue Field's benchmarks, and wholly neglected to mention others of Blue Field's benchmarks. Issues & Decisions Memorandum at 7–15, PD II 66 at bar code 3095471-01 (Sept. 5, 2012), ECF No. 18 (Nov. 20, 2012) ("PD II 66"). Blue Field filed a summons and complaint with this court on October 11, 2012.

### C.  Tables Summarizing Relevant Data

To simplify the morass of data at play in this case, the court summarizes relevant surrogate and benchmark information in the tables below. Table 1 lists record data respecting rice straw. The data are numbered 1S through 10S ("S" stands for straw), roughly in the order Commerce received them from the parties. Table 1 also gives the names of the data, including country of origin; the items that the data values; the U.S. dollar price of the items per metric ton; the party that proposed the data, including record citations; and the proposed use of the data in setting surrogate prices (i.e., as a surrogate, as a benchmark, or both). Table 2 provides the same information for cow manure surrogates and benchmarks. The data are numbered 1M through 9M ("M" stands for manure). The court refers to these data by number in parentheticals throughout the opinion.[7]

---

[7] The parties presented other data during administrative proceedings that were not directly addressed or explained on appeal. These data include: (1) Colombian rice grain import prices, PD II 60 at Attach. 3; (2) Brazilian manure prices reported in a university study, PD II 58 at Ex. 2, PD II 57 at Ex. 8; and (3) Indian manure prices reported in an FAO study, PD II 58 at Ex. 2, PD II 57 at Ex. 9. Blue Field mentioned the (footnote continued)

| No. | Data Name (Country) | Item Valued | Price Per Metric Ton | Proposing Party (Citation) | Use of Data |
|---|---|---|---|---|---|
| 1S | GTA Harmonized Tariff Schedule ("HTS") 1213.00 Import Price (Colombia) | Cereal straw and husks, unprepared, whether or not chopped, ground, pressed or in the form of pellets | $1350.88 | Monterey Mushrooms (PD II 24 at Ex. 5) | Surrogate |
| 2S | 2006–2007 Company Data (India) | Straw | $80.38 | Blue Field (PD II 35 at Ex. 1) | Surrogate & Benchmark |
| 3S | 2009–2010 Company Data (India) | Wheat Straw | $90.08 | Blue Field (PD II 43–44 at Ex. 1) | Surrogate & Benchmark |
| 4S | 2007 USAID Report (Indonesia) | Rice Straw | $13.70 | Blue Field (PD II 57 at Ex. 4) | Surrogate & Benchmark |
| 5S | GTA HTS 1213.00 Export Price (United States) | Cereal straw and husks, unprepared, whether or not chopped, ground, pressed or in the form of pellets | $10.00 | Blue Field (PD II 55 at Ex. 1) | Benchmark |
| 6S | USDA National Hay, Feed & Seed Summary (United States) | Rice Straw | $44.38 | Blue Field (PD II 55 at Ex. 2) | Benchmark |
| 7S | Internet Offer (United States) | Rice Straw | $82.65 | Blue Field (PD II 56 at Ex. 3) | Benchmark |
| 8S | Wholesale Rice Price (Colombia) | Grain Rice | $400.00 | Blue Field (PD II 57 at Ex. 6) | Benchmark |
| 9S | Retail Rice Price (Colombia) | Grain Rice | $690.00 | Blue Field (PD II 57 at Ex. 5) | Benchmark |
| 10S | GTA HTS 1213.00 Import Prices (Philippines, South Africa, Thailand) | Cereal straw and husks, unprepared, whether or not chopped, ground, pressed or in the form of pellets | $890.00–$1560.00 | Monterey Mushrooms (PD II 60 at Attach. 2) | Benchmark |

**Table 1: RICE STRAW**

Brazilian data only obliquely in its 56.2 Brief and did not include the data in the data summary in its Reply Brief. Pl.'s 56.2 Br. 22, ECF No. 28; Pl.'s Reply Br. 8–9, ECF No. 36. Blue Field entirely neglected to address the FAO data and Colombian rice import data in its briefing. And though the government mentioned the Brazilian study and the Colombian FAO study in its Response Brief, because Blue Field did not raise them in its briefing, the court will not address them. *See* Def.'s Resp. Br. 23, ECF No. 32.

| No. | Data Name (Country) | Item Valued | Price Per Metric Ton | Proposing Party (Citation) | Use of Data |
|---|---|---|---|---|---|
| | | **Table 2: COW MANURE** | | | |
| 1M | GTA HTS 3101.00 Import Price (Colombia) | Animal or vegetable fertilizers, whether or not mixed together or chemically treated; fertilizers produced by the mixing or chemical treatment of animal or vegetable product | $1337.94 | Monterey Mushrooms (PD II 24 at Ex. 3) | Surrogate |
| 2M | 2004–2005 Company Data (India) | Cow Manure | $21.55 | Blue Field (PD II 35 at Ex. 1) | Surrogate & Benchmark |
| 3M | 2009–2010 Company Data (India) | Chicken Manure | $133.28[8] | Blue Field (PD II 43– 44 at Ex. 1) | Surrogate & Benchmark |
| 4M | 1999 Organic Fertilizer Report (Colombia) | Organic fertilizer | $162.04 | Blue Field (PD II 57 at Ex. 11) | Benchmark[9] |
| 5M | Commercial Feed Yard Price (United States) | Cow Manure | $10.50 | Blue Field (PD II 57 at Ex. 8) | Benchmark |
| 6M | Internet Offer (United States) | Bagged Cow Manure | $220.00 | Blue Field (PD II 57 at Ex. 8) | Benchmark |
| 7M | 2004 Chicken & Swine Manure Sales (Philippines) | Chicken & Swine Manure | $5.48 | Blue Field (PD II 57 at Ex. 10) | Benchmark |
| 8M | Retail Hamburger Price (Colombia) | Hamburger Meat | $1940.00 | Blue Field (PD II 57 at Ex. 5) | Benchmark |
| 9M | GTA HTS 3101.00 Import Prices (Indonesia, Philippines, South Africa, Thailand, Ukraine) | Animal or vegetable fertilizers, whether or not mixed together or chemically treated; fertilizers produced by the mixing or chemical treatment of animal or vegetable product | $300.00–$2110.00 | Monterey Mushrooms (PD II 60 at Attach. 1) | Benchmark |

---

[8] Blue Field's Reply Brief says the 2009–2010 Indian data sets the price of cow manure at $133.28 per metric ton. Pl.'s Reply Br. 9. In the 56.2 Brief, however, Blue Field says the price is $28.73 per metric ton. Pl.'s 56.2 Br. 5, 12. Commerce must determine which price is correct when considering the 2009–2010 data on remand.

[9] In its case brief, Blue Field said Commerce could use the 1999 Colombian fertilizer data and the 2003 Philippines manure data as surrogates for cow manure. PD II 58 at 12–13. Blue Field does not propose these data as surrogates in its briefing on appeal. See, e.g., Pl.'s 56.2 Br. 22. The court thus treats these data as benchmarks only.

## II.    EXHAUSTION OF REMEDIES

Before assessing the merits, the court must resolve the government's administrative

exhaustion challenge. Def.'s Resp. Br. 29–35, ECF No. 32. The government asks the court to

reject on appeal a number of Blue Field's arguments, which allegedly were never made before

Commerce:

(1) Commerce should have considered 2009–2010 Indian company data as surrogates for rice straw and cow manure (3S, 3M);

(2) Commerce's surrogate value for rice straw was aberrational compared with 2007 Indonesian straw prices (4S), a U.S. Internet straw offer (7S), Colombia wholesale rice prices (8S), Colombian retail rice prices (9S), and Colombian rice import data (10S);

(3) Commerce's surrogate value for cow manure is aberrational compared to manure prices from U.S. feed yards (5M), a Colombian fertilizer study (4M), a livestock study from the Philippines (7M), and Colombian retail prices for hamburger meat (8M);

(4) Monterey Mushrooms' benchmarks from Indonesia, the Philippines, South Africa, Thailand, and Ukraine were not specific to Blue Field's inputs, contained unrepresentative volumes and high prices, and should be disregarded under Commerce's practice of favoring domestic prices over import statistics (10S, 9M); and

(5) Commerce's surrogate values for rice straw and cow manure are aberrational due to small import volumes (1S, 1M).

*See id.* at 30–31.

This court has discretion to determine when it will require the exhaustion of

administrative remedies. *See* 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall,

where appropriate, require the exhaustion of administrative remedies."). When choosing how to

exercise this discretion, the court is mindful of two aims: the preservation of agency authority

and the promotion of judicial efficiency. *See McCarthy v. Madigan*, 503 U.S. 140, 145 (1992);

*Carpenter Tech. Corp. v. United States*, 30 CIT 1373, 1374–75, 452 F. Supp. 2d 1344, 1346

(2006). Accordingly, the court permits parties to raise arguments on appeal if they first made

those arguments on the administrative record. This approach ensures Commerce has the

opportunity to consider arguments during agency proceedings, and before a judge intervenes on

appeal. *See Rhone Poulenc*, 899 F.2d at 1191; *Trust Chem Co. v. United States*, 35 CIT __, __,

791 F. Supp. 2d 1257, 1268 n.27 (2011).

Applying this test, the court finds Blue Field exhausted its remedies respecting the 2009–

2010 Indian data, the rice straw and cow manure benchmarks, and Blue Field's assault on

Monterey Mushrooms' benchmarks. Blue Field did not exhaust its remedies regarding its

sample-size and domestic pricing arguments.

**A.  Blue Field Exhausted Remedies Respecting the 2009–2010 Indian Company Data**

The government claims that Blue Field never proposed 2009–2010 Indian data (3S, 3M)

as surrogates and benchmarks for straw and manure. Def.'s Resp. Br. 30. Blue Field rejoins that

it "specifically" asked Commerce in its case brief to use these data as surrogate prices. Pl.'s

Reply Br. 4–5 (citing PD II 58 at 14).

The administrative record tells a more nuanced tale. Contrary to the government's view,

Blue Field indeed offered the 2009–2010 Indian data in a supplemental surrogate value

submission. PD II 43 at 3. In the submission, Blue Field claimed the 2009–2010 data should

"undoubtedly supersede [Monterey Mushrooms'] Columbian [sic] customs data, which is vague

and not input-specific." *Id.* Blue Field failed, however, to cite the 2009–2010 Indian data in its

case brief. *See* PD II 58. The case brief instead offered 2004–2005 and 2006–2007 Indian

statistics for rice straw and cow manure surrogates (2S, 2M), and generally petitioned Commerce

to use Indian data in lieu of Monterey Mushrooms' Colombian data. *Id.* at 14 ("In light of the

extremely unreasonably high import prices for fertilizer and cereal straw and husk in various

forms that the Department used in the preliminary results, the Department could continue to use the Indian price information for similar products used in the previous reviews to properly evaluate the cost of such materials."). None of Blue Field's submissions following the case brief referenced the 2009–2010 data, either.

Plaintiff's approach to the 2009–2010 Indian data does not epitomize how parties should exhaust their administrative remedies. Blue Field would have spared itself trouble had it incorporated all of its surrogate data into the case brief. Nevertheless, the court holds Blue Field exhausted its remedies regarding the 2009–2010 Indian data. Arguments made in Blue Field's case brief—together with the supplemental surrogate submission's energetic petition for Commerce to use the Indian data—were enough to notify Commerce of Blue Field's arguments regarding those data. *See Trust Chem*, 35 CIT at __, 791 F. Supp. 2d at 1268 n.27 (exhaustion satisfied when information cited on appeal was "necessarily before the agency" below); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1259 (Fed. Cir. 2009) (exhaustion satisfied where record contained "at least a suggestion" of plaintiff's argument on appeal); *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (holding parties must present arguments in case briefs as prerequisite for judicial review).

Contrary to the government's briefing, *Gerber Food (Yunnan) Co. v. United States*, 33 CIT 186, 601 F. Supp. 2d 1370 (2009), counsels nothing different. *See* Def.'s Resp. Br. 33. In *Gerber*, 33 CIT at 193–94, 601 F. Supp. 2d at 1378–79, plaintiff challenged Commerce's margin calculation methodology before the agency, but it failed to argue the margin was unsupported in facts and punitive. On appeal, plaintiff was allowed to challenge Commerce's dumping margin generally. The court did not, however, countenance plaintiff's additional claims that the margin was punitive and factually unsupported. *Id.* at 194–95, 601 F. Supp. 2d at 1379. The court

refused these new claims because plaintiff had not raised them in the case brief, depriving

"Commerce of the opportunity to reconsider, and possibly depart from," its determination in the

preliminary results. *Id.* By contrast, Blue Field gave Commerce the opportunity to reconsider the

2009–2010 Indian data in two documents—the supplemental surrogate submission and the case

brief—both of which urged Commerce to use Indian instead of Colombian surrogates. *See* PD II

43 at 3; PD II 58 at 13–14.

**B.  Blue Field Exhausted Remedies Respecting Possible Aberrations in Commerce's
     Surrogate Data**

      The government also says Blue Field failed to tell Commerce that the Colombian

surrogates appeared aberrational compared to benchmarks in the record. Def.'s Resp. Br. 30. The

court disagrees.

      Blue Field's case brief left few adjectives unsung in characterizing Commerce's straw

and manure surrogates as aberrational. PD II 58. There, Blue Field described the Colombian data

as "wholly unreliable," *id.* at 7, "totally unreliable," *id.* at 8, "completely irreconcilable with U.S.

export data," *id.* at 9, "completely inconsistent with all record evidence," *id.* at 11, "extremely

unreasonably high," *id.* at 14, and "the worst information on the record," *id.* at 11. The case brief

also offered as benchmarks U.S. export data for cereal straw and husks (5S); USDA feed data

(6S); U.S. manure retail prices (6M); and manure prices from a study on organic fertilizer (4M).

*Id.* at 8, 11, 12. Blue Field did not cite other potential benchmarks—i.e., the ones Commerce

wants the court to reject now—in its case brief.[10] Instead, Blue Field provided these benchmarks

---

[10] By way of reminder, those contested benchmarks are: 2007 Indonesian straw prices (4S); a U.S. Internet straw offer (7S); Colombia wholesale rice prices (8S); Colombian retail rice prices (9S); manure prices from U.S. feed yards (5M); a Colombian fertilizer study (4M); a livestock study from the Philippines (7M); and Colombian retail prices for hamburger meat (8M).

in a surrogate value submission dated April 9, 2012. PD II 55–57. Blue Field categorized the

data in a neat table on the submission's second page.

The logic that applied to the 2009–2010 Indian data applies here too. Blue Field argued in

its case brief that Commerce's surrogates for rice straw and cow manure were aberrantly high.

Blue Field furnished data to support this argument in a surrogate value submission, which

summarized all the data sources the government asks the court to reject. PD II 55 at 2.

Furthermore, Blue Field invited Commerce to contact its consulting firm with questions, if any,

about the data. *Id.* at 1. The circumstances show Commerce had an opportunity to assess Blue

Field's benchmarks but neglected to do so. *See Trust Chem*, 35 CIT at __, 791 F. Supp. 2d at

1268 n.27.

**C. Blue Field Exhausted Remedies Respecting Aberrations in Monterey Mushrooms'
   Benchmarks**

The government next claims Blue Field did not challenge before the agency aberrations

in Monterey Mushrooms' benchmarks (10S, 9M). Def.'s Resp. Br. 30. Although this observation

is accurate, the court again rules for Blue Field.

Monterey Mushrooms submitted its benchmarks on April 19, 2012, the day the parties

turned in their case briefs. *See* PD II 60. On April 24, Blue Field asked Commerce to reject the

benchmarks under 19 C.F.R. § 351.301(c)(1), which permits Commerce to refuse untimely filed

information. PD II 61 at 1–2. Monterey Mushrooms responded by attacking Blue Field's

benchmark data and surrogates. PD II 62. Then, on May 11, Blue Field sent yet another

document to Commerce urging it to reject Monterey Mushrooms' benchmarks as untimely filed.

Blue Field's Request to Reject Petitioner's Rebuttal Brief, PD II 63 at bar code 3075123-01

(May 11, 2012), ECF No. 18 (Nov. 20, 2012). Despite Blue Field's petitions, Commerce adopted

the benchmarks in its I&D Memo. *See* PD II 66 at 8 n.56. In fact, the benchmarks became the

centerpiece of Commerce's strategy to defend its straw and manure surrogates.

Ordinarily, the court would refuse to hear Blue Field's challenge to Monterey

Mushrooms' benchmarks: An argument not made below is an argument forfeited on appeal.

However, it appears Monterey Mushrooms provided the benchmarks after the record closed to

additional factual submissions. And although Commerce said the benchmarks properly rebutted

Blue Field's attacks on the Colombian surrogates, it was not unreasonable for Blue Field to

challenge the benchmarks solely for untimeliness. *See* 19 C.F.R. § 351.301(c)(1) (allowing

Commerce to reject new factual information if untimely filed). The court will thus consider Blue

Field's challenge to Monterey Mushrooms' data. *See Zhengzhou Harmoni Spice Co. v. United

States*, 33 CIT 453, 495–96 n.49, 617 F. Supp. 2d 1281, 1318 n.49 (2009) (permitting plaintiff to

respond to argument first raised in issues and decisions memorandum).

### D.  Blue Field Did Not Exhaust Remedies Respecting the Sample Size of Colombian Surrogates

The government next claims Blue Field failed to argue below that small sample sizes

caused aberrations in the Colombian surrogates (1S, 1M). Def.'s Resp. Br. 31; *see also* Pl.'s 56.2

Br. 23–25, ECF No. 28 ("56.2 Brief"). The evidence supports the government's position.

After scouring the record, the court cannot find where Blue Field said small sample sizes

caused aberrations in the Colombian surrogates. The argument is found neither in Blue Field's

case brief, nor in submissions following Commerce's Preliminary Results. Furthermore,

although Blue Field tries to stitch together an argument by citing to an early Monterey

Mushrooms submission and Blue Field's Section C and D questionnaires, these documents

supply little more than raw numbers. Monterey Mushrooms' submission recites Colombian

import quantities for cereal straw and fertilizer, PD II 24 at Exs. 3, 5, and Blue Field's

questionnaire lists its own input consumption data, PD I 44 at Exs. D-5, D-6. Unless Commerce

employs statistical bloodhounds to sniff out arguments buried in unprocessed data, Blue Field's

record submissions were inadequate to alert Commerce to Blue Field's sample-size argument.

*See Gerber*, 33 CIT at 194–95, 601 F. Supp. 2d at 1379 (refusing to hear various challenges to

dumping margin, although general challenge to margin sustained).

Blue Field retorts that the court may waive "the exhaustion requirement in situations

where mandating exhaustion would not serve any useful purpose." Pl.'s Reply Br. 2 (citing

*Pakfood Pub. Co. v. United States*, 34 CIT __, __, 724 F. Supp. 2d 1327, 1350–51 (2010)). The

court will not apply this exception here. In *Corus Staal*, 502 F.3d at 1378–79, for example, the

Federal Circuit refused to apply the futility exception where plaintiff Corus failed to exhaust a

duty absorption argument before the agency. Corus had raised the argument preceding the

preliminary results, but Commerce rejected Corus' argument in those results. Corus thus thought

it unnecessary to repeat the argument in its case brief. *Id.* The Federal Circuit held the futility

exception inapplicable, because Commerce might have adopted Corus' position in the final

results had Corus presented the argument again in its case brief. *Id.* at 1380.

Blue Field, by contrast, failed to raise its sample-size argument at all, anywhere in the

record. There is no evidence that Commerce would have rejected Blue Field's argument out-of-

hand for legal or policy reasons. *See id.*; *Itochu Bldg. Prods. v. United States*, No. 2013-1044,

2013 WL 4405863, at *6–7 (Fed. Cir. Aug. 19, 2013) (applying futility exception where statute

required Commerce to reject plaintiff's argument below). Consequently, the court refuses to hear

Blue Field's sample-size argument on appeal.

### E.  Blue Field Did Not Exhaust Remedies Respecting Domestic Data Use

The court also rejects Blue Field's argument that Commerce should have used domestic prices, and not import prices, to value Blue Field's inputs. *See* Def.'s Resp. Br. 30. Blue Field did not raise this point in its case brief. The only data Blue Field cites to support its argument come from questionnaire responses from July 2011, a date long before the Preliminary Results issued. PD I 44. The questionnaire responses indicated only that Blue Field purchased its inputs domestically. They did not attack Commerce's choice to use import data instead of domestic data to value rice straw and cow manure. Blue Field's faltering effort below could not have alerted Commerce to the domestic price argument made now on appeal.

### III.   COMMERCE'S DUMPING MARGIN IS NOT BASED IN SUBSTANTIAL EVIDENCE

Blue Field's complaint centers on the dumping margin Commerce assigned its mushroom exports during the twelfth administrative review. In the preceding review, Commerce had assigned a 2.17% margin to Blue Field's mushrooms. In the twelfth review, Commerce assigned a 308.33% margin. *See* Final Results at 55,809. Blue Field blames the increased margin on inflated surrogate values for rice straw and cow manure, two key inputs in its mushroom cultivation. Specifically, Blue Field alleges Commerce failed to ground its surrogate values for these inputs in substantial evidence.[11]

### A.  Standard of Review

The court must remand any agency determination, including Commerce's surrogate value choices, "found . . . to be unsupported by substantial evidence on the record, or otherwise not in

---

[11] The government and Monterey Mushrooms argue that Blue Field's increased dumping margin resulted from an actual increase in dumping. Def.'s Resp. Br. 11; Def.-Intervenor's Br. 5, ECF No. 35. This argument is irrelevant. Blue Field challenges only whether Commerce based its rice straw and cow manure surrogate prices in substantial evidence. *See* Pl.'s 56.2 Br. 10 ("The use of horrendously aberrational surrogate prices to value Blue Field's reported factors of production for rice straw and cow manure greatly overstated Blue Field's margins in this review . . . ."). Blue Field does not challenge the high dumping margin per se, but instead contests the results of using allegedly overstated surrogate values.

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). As discussed in Part I, the law requires

Commerce to base surrogate prices for inputs on "the best available information" regarding those

inputs from a comparable market economy. *Id.* § 1677b(c)(1). The court will uphold

Commerce's surrogate value choices if the agency fairly considered record evidence when

choosing surrogates, so that a reasonable mind could accept Commerce's findings. *See Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *CITIC Trading Co. v. United States*, 27 CIT 356,

361 (2003).

**B. Commerce's Surrogate Value for Rice Straw Was Not Supported by Substantial Evidence**

Blue Field advances three arguments to show Commerce's rice straw surrogate was

unfounded in substantial evidence. First, in Blue Field's view, Commerce's rice straw surrogate

was aberrantly high compared to benchmarks in the record. Second, Blue Field claims the

Colombian surrogate value, which comprised prices for straw and other cereal products, was not

specific to Blue Field's rice straw inputs. Third—and in light of these apparent flaws in

Commerce's data—Blue Field contends the agency improperly rejected alternative surrogates

from Indonesia and India. The court holds for Blue Field.

i.      Commerce Failed to Explain Possible Aberrations in Its Colombian Surrogate

Blue Field argues that the Colombian surrogate (1S) was aberrantly high and

unrepresentative of Blue Field's actual input costs. This argument breaks into three subparts.

First, Blue Field says benchmarks in the record required Commerce to justify its chosen

surrogate, but Commerce failed to do so. Second, Blue Field argues Commerce gave inadequate

reasons for rejecting Blue Field's benchmarks. Third, Blue Field says Monterey Mushrooms'

benchmarks (10S), which purport to corroborate the Colombian surrogate, are themselves

aberrant and do not support Commerce's surrogate choice.

The law gives Commerce discretion to choose among potential surrogate values on the record. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999). "[S]imply because there are lower . . . prices on the record, Commerce does not lose its discretion to determine what it believes constitutes the 'best available information' within the meaning of 19 U.S.C. § 1677b(c)(1)." *China First Pencil Co. v. United States*, 34 CIT __, __, 721 F. Supp. 2d 1369, 1381 (2010). However, even though it enjoys some discretion in selecting the best available information, Commerce must defend its surrogate choices when confronted with data undermining the surrogate's reliability. *Mittal Steel*, 31 CIT at 1135, 502 F. Supp. 2d at 1308; *Jinan Yipin Corp. v. United States*, 35 CIT __, __, 800 F. Supp. 2d 1226, 1304–05 (2011). If the agency's surrogate prices diverge violently from credible benchmark prices, Commerce must explain why it chose to reject plaintiff's data while crediting its own. *See Peer Bearing*, 35 CIT at __, 752 F. Supp. 2d at 1371.

Applying these standards, the court finds Commerce did not base its rice straw surrogate in substantial evidence. Blue Field's data suggested—rather elegantly in the court's view—that something was wrong with Commerce's surrogate. As summarized in Table 1 above, benchmarks from India, Indonesia, and the United States offered a range of rice straw prices between $10.00 and $90.08 per metric ton (2S–7S). *See* Pl.'s Reply Br. 8–9. Although this range is itself rather broad, all values within that range are lower than the $1350.88 price Commerce adopted (1S). Blue Field's statistics on rice grain prices in Colombia are also telling. In 2004, rice cost $690.00 per metric ton at retail, almost $600.00 less than Commerce's proposed price for rice straw. This disparity makes little sense. Rice straw, presumably a low-cost byproduct of rice grain cultivation, should not cost more than the primary good itself (8S–9S). *Id.* at 9; PD II 57 at Ex. 5.

These benchmarks should have alerted Commerce to potential aberrations in its rice straw surrogate (1S). And "[w]hen confronted with a colorable claim that the data that Commerce is considering is aberrational," Commerce is obligated, at a minimum, to discuss competing evidence and decide whether to credit or reject it. *Mittal Steel*, 31 CIT at 1135, 502 F. Supp. 2d at 1308. Yet in the I&D Memo, Commerce failed even to mention Blue Field's USDA hay data (6S), the U.S. Internet offer (7S), and the Colombian wholesale and retail rice prices (8S, 9S). Commerce also did not explain why it dismissed Blue Field's Indonesian and Indian data for use as benchmarks (2S–4S). *See* PD II 66 at 10–11, 15. Although Commerce offered reasons for rejecting these data for use as surrogates, *see infra* Part III(B)(iii), it did not explain whether the data were suitable as benchmarks to corroborate the Colombian surrogate, *see* PD II 66 at 10; *Peer Bearing*, 35 CIT at __, 752 F. Supp. 2d at 1372 (approving use of data as benchmarks). Commerce must reconsider its rice straw surrogate in light of these benchmarks on remand.[12]

Furthermore, despite Blue Field's benchmarks, Commerce failed to bolster its rice straw surrogate with credible corroborating data. When confronted with a claim that its surrogate is aberrational, Commerce must explain why the data it chose are reliable and nondistortive. *Mittal Steel*, 31 CIT at 1135, 502 F. Supp. 2d at 1308–09; *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, Slip Op. 13-30, 2013 WL 920276, at *4 (CIT Mar. 12, 2013). Here, Commerce tried to justify its Colombian surrogate by citing Monterey Mushrooms' benchmarks from Thailand, South Africa, and the Philippines (10S). Commerce argued that the Colombian surrogate price, $1.28 per kilogram, fell within a range of prices from comparable economies,

---

[12] Of Blue Field's benchmarks, the only one Commerce successfully rejected was the U.S. export data (5S). In the I&D Memo, Commerce faulted Blue Field's U.S. export data because they excluded delivery charges, while Commerce's Colombian surrogate (1S) did not. PD II 66 at 10. Because this discrepancy could cause the U.S. data not to correlate with the Colombian data, Commerce could reject the data for use as a benchmark. *See Zhejiang*, 32 CIT at 681. Commerce offered other reasons for rejecting the U.S. export data, but the court finds them unpersuasive.

varying from $0.89 per kilogram in Thailand to $1.56 per kilogram in the Philippines. *See* PD II

66 at 10. In Commerce's view, these data neutralized Blue Field's benchmarks and proved "that

the Colombian import data is representative of market averages for rice straw." *Id.*

Still, Commerce failed to consider whether Monterey Mushrooms' benchmarks were

themselves aberrational. According to Blue Field, the prices reflected in these data were based on

commercially miniscule import volumes. Pl.'s 56.2 Br. 26–27. During the period of review,

Monterey Mushrooms' benchmark countries imported a total of about seventy metric tons of

cereal husks and straw under HTS 1213.00. Blue Field, by contrast, consumed almost forty-

thousand metric tons of rice straw in its mushroom cultivation during the same period. *Id.* Given

these facts, Commerce should have analyzed whether Monterey Mushrooms' benchmark data

actually supported the Colombian surrogate. *See Jinan Yipin*, 35 CIT at __, 800 F. Supp. 2d at

1298 (rejecting skewed corroborating data); *Xinjiamei*, 2013 WL 920276, at *4 (suggesting small

import volumes may cause aberrations). But it did not. Absent properly vetted benchmarks to

corroborate the Colombian data, Commerce's rice straw surrogate—which Blue Field vigorously

assailed as aberrational—lacked foundation in substantial evidence.

ii.     Commerce's Defense Against Blue Field's Product-Specificity Challenge Was Not
        Based in Substantial Evidence

Blue Field next claims that Commerce's surrogate (1S) did not reflect the market price

for rice straw. Instead, the surrogate comprised the average value of a variety of cereal products,

including chopped and pelletized husks—all of which could be more expensive than rice straw.

Blue Field argues that alternative surrogates were more specific to its input, and consequently,

that Commerce's surrogate is unsubstantiated in evidence and not the "best available

information" on the record. *See* PD II 58 at 7–9.

In administrative reviews, foreign producers bear a *de facto* burden to show that Commerce's surrogate is not specific to a disputed input. *See Peer Bearing Co. v. United States*, 36 CIT __, __, 884 F. Supp. 2d 1313, 1331–32 (2012) (discussing evidence showing Commerce's basket data not specific to plaintiff's input); *Longkou Haimeng Mach. Co. v. United States*, 32 CIT 1142, 1164, 581 F. Supp. 2d 1344, 1363 (2008) (noting plaintiff's input not the same product valued in Commerce's basket); *see also China First Pencil Co.*, 34 CIT at __, 721 F. Supp. 2d at 1380–81 (upholding Commerce's use of basket data where plaintiff produced nothing to show distortion); *Dorbest Ltd. v. United States*, 30 CIT 1671, 1702–03, 462 F. Supp. 2d 1262, 1290–91 (2006) (same). If the foreign producer offers alternative, input-specific surrogates on the record, the court may find Commerce's reliance on basket data unreasonable. *See Zhengzhou*, 33 CIT at 487, 617 F. Supp. 2d at 1312 (offering product-specific surrogates); *Jinan Yipin Corp. v. United States*, 31 CIT 1901, 1934–38, 526 F. Supp. 2d 1347, 1376–79 (2007) (finding unreasonable Commerce's reliance on basket data).

Here, Blue Field made little effort to show the Colombian surrogate (1S) was not specific to rice straw. In its case brief, Blue Field observed only that the Colombian surrogate comprised average import prices for "cereal straw and husks, unprepared, whether or not chopped, ground, pressed or in the form of pellets," as delineated in HTS 1213.00. Hypothetically, this basket average could encompass products much more expensive than Blue Field's input. *See* PD II 58 at 7. But Blue Field offered no concrete evidence to prove this was the case. *See id.* at 7–9; Def.'s Resp. Br. at 18. Had it argued more effectively, Blue Field might have submitted data showing HTS 1213.00 primarily values cereal products more expensive than Blue Field's input. This technique has proven effective in similar surrogate value disputes. *See, e.g.*, *Peer Bearing*, 36 CIT at __, 884 F. Supp. 2d at 1331–32.

Despite deficiencies in Blue Field's argument, the court holds Commerce must reconsider the specificity of its rice straw surrogate on remand. Blue Field offered abundant evidence that Commerce's surrogate was aberrational, *see supra* Part III(B)(i), and these aberrations may stem from specificity problems in the Colombian data (1S). Furthermore, although Commerce attempted to reject Blue Field's alternative surrogates as discussed in greater detail below, *see infra* Part III(B)(iii), the court finds most of these arguments unconvincing. Commerce could not paper over specificity problems in its own surrogate by exaggerating flaws in Blue Field's. *See Zhengzhou*, 33 CIT at 498, 617 F. Supp. 2d at 1321; *Taian Ziyang Food Co. v. United States*, 35 CIT __, __, 783 F. Supp. 2d 1292, 1330 (2011). The agency's rice straw surrogate was thus not based in substantial evidence.

iii.   Commerce Reasonably Rejected Blue Field's Indonesian Surrogate, but Not the Indian Surrogates

Although Blue Field struggled to prove Commerce's surrogate was insufficiently specific to rice straw, Blue Field's benchmarks uncovered possible aberrations in the Colombian data (1S). Consequently, Commerce was required to explain why it rejected Blue Field's less expensive and possibly more specific surrogate candidates (2S–4S). Commerce retorts that it adequately explained why it rejected Blue Field's competing data.

Again, Commerce must defend its surrogate choices when the record suggests other data more accurately value plaintiff's inputs. *See Mittal Steel*, 31 CIT at 1135, 502 F. Supp. 2d at 1308. The agency's rationale for rejecting Blue Field's 2006–2007 Indonesian data (4S) meets this standard. In the I&D Memo, Commerce noted that the Indonesian data came from only two sources—a Central Javan dairy and an East Javan trader. This small sample size gives pause to ask whether the data actually represented average prices for rice straw. PD II 66 at 10. Commerce also faulted Blue Field's data for failing to indicate whether the Indonesian prices

were exclusive of taxes. *Id.* at 10–11. These flaws likely undermine the data's reliability. They

also undercut Blue Field's argument that the Indonesian surrogate was clearly superior to the

Colombian surrogate. *See* 19 U.S.C. § 1677b(c)(1); *Polyethylene Retail Carrier Bag Comm. v.

United States*, 29 CIT 1418, 1444 (2005) (rejecting data from single source in favor of

countrywide data).[13] When asked to pass judgment on Commerce's choice between two

imperfect datasets, the court defers to Commerce.

By contrast, Commerce inadequately explained why it rejected Blue Field's Indian

surrogates (2S, 3S). The agency made no mention of Blue Field's 2009–2010 data (3S) anywhere

in the record. Commerce could not dismiss these data by ignoring their existence.[14] And although

Commerce expressly discredited Blue Field's 2006–2007 Indian data (2S), its reasons for doing

so were unpersuasive. In the I&D Memo, Commerce declined to use the 2006–2007 data, stating

the agency had chosen Colombia as its lead surrogate country, and Colombia met Commerce's

criteria for selecting surrogate values. PD II 66 at 15. But this reasoning failed to explain why

Commerce preferred the Colombian surrogate despite its apparently aberrational qualities. *See*

---

[13] Commerce made additional arguments regarding the Indonesian data, but the court finds them unconvincing. In the I&D Memo, Commerce said it rejected the Indonesian information because it was neither from Colombia nor contemporaneous with the period of review. PD II 66 at 10. When surrogate information from Colombia was unavailable, however, Commerce valued a number of Blue Field's inputs using data from countries other than Colombia. Preliminary Results, 77 Fed. Reg. at 13,267 (listing Ukraine and the Philippines as surrogate countries for mushroom spawn and land rent). And although 19 C.F.R. § 351.408(c)(2) states Commerce's preference to use data from one surrogate country to value product inputs, this preference does not trump Commerce's obligation to value inputs using the "best available information." 19 U.S.C. § 1677b(c)(1); *see Taian Ziyang Food*, 35 CIT at __, 783 F. Supp. 2d at 1330 (recognizing Commerce's duty to use "best available information," despite policy preferences).
    Commerce's contemporaneity argument is similarly unavailing. Record evidence indicates Commerce applied price multipliers to a number of Blue Field's inputs to make them contemporary with the period of review. Blue Field & Xingda Surrogate Values Memo at Ex. 2, PD II 46 at bar code 3061065-01 (Mar. 2, 2012), ECF No. 18 (Nov. 20, 2012). Nor does the law prohibit Commerce from using data that is not contemporaneous with the period of review when necessary to produce accurate surrogates. *See Shakeproof Assembly Components v. United States*, 30 CIT 1173, 1178–79 (2006).

[14] Although the parties made a number of arguments on appeal regarding whether Commerce could use the 2009–2010 data as surrogates—Blue Field argued, for example, that the 2009–2010 data were contemporaneous with the review period because they coincided by two months—the court will not address these arguments. *See* Pl.'s 56.2 Br. 17–18.

*Clearon Corp. v. United States*, Slip. Op. 13-22, 2013 WL 646390, at *6 (CIT Feb. 20, 2013)

(recognizing country of origin as a tie-breaking variable when two surrogates equally qualified to

value input). Commerce also argued it could not use the Indian data because India was not on

Commerce's list of approved surrogate countries. PD II 66 at 15. Yet Commerce itself stated that

its surrogate country list was "non-exhaustive" and that the agency could consider data from

other countries "if the record provides [the agency] adequate information to evaluate them."

Request for Surrogate Countries at 1–2, PD II 12 at bar code 3034707-01 (Oct. 12, 2011), ECF

No. 18 (Nov. 20, 2012) ("PD II 12"). Furthermore, the statute permits Commerce to take

surrogates from countries not economically comparable to China when data from economically

comparable countries are not probative of input prices. 19 U.S.C. § 1677b(c)(4) (requiring

Commerce to value inputs from economically comparable countries "to the extent possible");

*DuPont Teijin Films v. United States*, 37 CIT __, __, 931 F. Supp. 2d 1297, 1300 n.1 (2013). In

light of possible aberrations in the Colombian surrogate, Commerce should not have ignored

useful data from countries not found in the agency's surrogate country list.[15]

      Furthermore, Commerce erred to say Blue Field provided no record evidence regarding

whether India is a significant producer of preserved mushrooms. PD II 66 at 15; *see also* 19

U.S.C. § 1677b(c)(4). In fact, Blue Field argued in its case brief that India is economically

comparable to China and a significant mushroom producer. PD II 58 at 13–14. Blue Field

---

      [15] This conclusion does not upset Commerce's preferences regarding surrogate data used in administrative reviews. *See supra* note 4 and accompanying text. In *Home Meridian International, Inc. v. United States*, 37 CIT __, __, 922 F. Supp. 2d 1366, 1372 (2013), the court recognized that Commerce values inputs using, in order of preference: "(1) Prices paid by the NME manufacturer for items imported from a market economy; (2) prices in the primary surrogate country of domestically produced or imported materials; (3) prices in one or more secondary surrogate countries reported by the industry producing subject merchandise in the secondary country or countries; and (4) prices in one or more secondary surrogate countries from sources other than the industry producing the subject merchandise." (citing *Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588, 20,590 (Dep't Commerce May 6, 1991) (final determination of sales at less-than-fair value)). In this case, Commerce's proposed surrogate data for rice straw comes from the second category, encompassing prices of imported and domestic goods in the primary surrogate country. Insofar as Blue Field's Indian data meet the statutory requirements for surrogate countries in 19 U.S.C. § 1677b(c)(4), Blue Field's Indian data could fall in Commerce's third category, comprising industry-reported input prices from secondary surrogate countries.

buttressed these claims by citing record data regarding India's economic situation and role as a

surrogate country in prior administrative reviews of the antidumping order on preserved

mushrooms. *Id.* at 14; Blue Field's Comments on Surrogate Selection, PD II 19 at bar code

3038725-01 (Nov. 2, 2011), ECF No. 18 (Nov. 20, 2012) ("PD II 19"). The court fails to see

how Commerce could review Blue Field's arguments, sift through the evidence, and still find

that Blue Field "ha[d] *not provided data* on whether India is a significant producer of

comparable merchandise." PD II 66 at 15 (emphasis added).

Commerce also erred in rejecting the 2006–2007 Indian data because they were not

contemporaneous with the period of review. *Id.* Indeed, Commerce may invoke contemporaneity

as a tie-breaking factor when choosing between equally reliable datasets. But contemporaneity

alone is an insufficient reason for dismissing alternative surrogates when Commerce's own

surrogate appears flawed. *See Shakeproof Assembly Components v. United States*, 30 CIT 1173,

1178–79 (2006). Furthermore, Commerce might have fixed contemporaneity problems in the

Indian data using a price multiplier, which Commerce applied to its energy, water, and land use

surrogates. Blue Field & Xingda Surrogate Values Memo at Ex. 2, PD II 46 at bar code

3061065-01 (Mar. 2, 2012), ECF No. 18 (Nov. 20, 2012); Preliminary Results, 77 Fed. Reg. at

13,268; *see also CITIC*, 27 CIT at 365–66 (recognizing that contemporaneity is not statutory

requirement under 19 U.S.C. § 1677b(c)).

For the reasons above, the court holds Commerce did not base its rice straw surrogate in

substantial evidence. On remand, Commerce must reevaluate its surrogate choice in light of Blue

Field's proposed surrogates and benchmarks (2S–3S, 6S–9S) and determine whether small

import volumes preclude using Monterey Mushrooms' data as benchmarks (10S). Commerce

also must decide whether the Colombian surrogate (1S) is in fact the "best available information"

on the record compared to Blue Field's Indian alternatives (2S–3S).

### C.  Commerce's Surrogate Value for Cow Manure Was Not Supported by Substantial Evidence

Commerce also failed to base its cow manure surrogate on substantial evidence. The

parties' arguments regarding cow manure are nearly identical to those applied to rice straw. *See*

*generally* Pl.'s 56.2 Br.; Def.'s Resp. Br. The court will thus use the same legal framework to

analyze Commerce's cow manure surrogate as it used for rice straw. *See supra* Part III(B).

i.  <u>Commerce Failed to Explain Possible Aberrations in Its Colombian Surrogate</u>

Blue Field makes three arguments regarding aberrations in Commerce's cow manure

surrogate (1M): first, that Blue Field's benchmark data required Commerce to explain

irregularities in the Colombian surrogate; second, that Commerce erroneously dismissed Blue

Field's benchmarks; and third, that Monterey Mushrooms' benchmarks (9M) failed to support

the Colombian surrogate. *See generally* Pl.'s 56.2 Br.

As with rice straw, the court finds Blue Field's benchmarks revealed possible aberrations

in Commerce's cow manure surrogate. *See supra* Part III(B)(i). Commerce's surrogate (1M)

valued cow manure at $1337.94 per metric ton. Blue Field's proposed surrogates, by contrast,

valued cow manure somewhere between $21.55 and $162.04 (2M–4M). Blue Field's

benchmarks, including U.S. and Filipino manure prices ranging from $5.48 to $220.00 (5M–

7M), also suggested the Colombian price was too high. Thus, Commerce had to explain

rationally why it rejected Blue Field's proposed surrogates and benchmarks. *See Peer Bearing*,

35 CIT at __, 752 F. Supp. 2d at 1371.

Commerce failed to do so when it rejected Blue Field's 2004–2005 Indian data for use as

a benchmark (2M). Commerce discredited these data for the same reasons it discredited Blue

Field's 2006–2007 Indian rice straw data. It said that Colombia (not India) was Commerce's lead

surrogate country, that India was not economically comparable to China, and that the data were

not contemporaneous with the review period. PD II 66 at 14–15. The court finds Commerce's

reasoning anemic. *See supra* Part III(B)(iii) (critiquing Commerce's reasons for rejecting Blue

Field's rice straw surrogates). Furthermore, Commerce entirely neglected to address Blue Field's

2009–2010 Indian data relating to cow manure (3M) and the Colombian hamburger data (8M).

Commerce must consider these data on remand.

The agency's conclusions regarding Blue Field's Philippines benchmarks are similarly

ill-conceived (7M). In the I&D Memo, Commerce disqualified the Philippines data because they

came from the Philippines, not Colombia. This argument falters, however, because Commerce

can use data as benchmarks, even if their country of origin precludes their use as surrogates. *Peer*

*Bearing*, 35 CIT at __, 752 F. Supp. 2d at 1372; *see supra* Part I(A). In any event, the Philippines

data came from a country on Commerce's surrogate list. *See* PD II 12 at 2 (listing Philippines as

surrogate country). Commerce's argument that the data were not contemporaneous with the

period of review also fails. *See supra* Part III(B)(iii). The court understands contemporaneity

may help Commerce choose between equally reliable datasets. Nonetheless, when Commerce's

data appear flawed, contemporaneity alone is an insufficient justification for dismissing better

surrogates and benchmarks. *See Shakeproof*, 30 CIT at 1178–79. The court also faults Commerce

for rejecting the Philippines data because chicken and swine manure are not specific to cow

manure. Commerce nowhere explained why swine and chicken manure are less specific to cow

manure than Commerce's own surrogate value, which comprised all kinds of fertilizers.[16]

---

[16] The court finds that Commerce satisfactorily explained its reasons for rejecting Blue Field's remaining benchmark data on cow manure. Commerce said U.S. feed yard prices (5M) represented the cost of producing manure, and concluded the feed yard data may not correlate with actual cow manure prices. PD II 66 at 14; *see Zhejiang*, 32 CIT at 681. Commerce also reasonably argued that discrepancies between "sale" (footnote continued)

Finally, the court declines to hold that Monterey Mushrooms' benchmarks (9M)

supported Commerce's choice to use the Colombian surrogate (1M). *See* PD II 66 at 14. Blue

Field observes in its briefing that manure import volumes from South Africa, the Philippines,

Indonesia, Ukraine, and Thailand were commercially small and potentially aberrational. Pl.'s

56.2 Br. 27. Commerce did not address this allegation below. Nor did it evaluate the credibility

of Monterey Mushrooms' benchmarks on the record. *See* PD II 61 at 1–2 (arguing to reject new

benchmark information). The agency cannot deflect allegations that its surrogate is aberrational

by raising untested benchmark data as a shield. In view of these arguments, the court finds

Commerce's Colombian cow manure surrogate (1M) was unsubstantiated in record evidence.

    ii.    <u>Commerce's Defense Against Blue Field's Product-Specificity Challenge Was Not Based in Substantial Evidence</u>

Blue Field also argues that Commerce's surrogate (1M) was not specific to cow manure

and was thus unfounded in substantial evidence. The arguments Blue Field makes here are

similar to those regarding rice straw. *See supra* Part III(B)(ii).

Blue Field challenged the Colombian surrogate's specificity by citing HTS 3101.00.

According to Blue Field, this subheading covers "animal and vegetable fertilizers, including

mixed or chemically treated," and "fertilizers made by mixing or chemically treating animal or

vegetable products"—a basket too broad, in Blue Field's view, to accurately value cow manure.

Pl.'s 56.2 Br. 31–32; PD II 58 at 10–13. Blue Field claimed its 2004–2005 and 2009–2010

Indian surrogates (2M–3M) were more specific to cow manure and the "best available

information" on the record. 19 U.S.C. § 1677b(c)(1).

---

and retail prices for U.S. bagged manure (6M) rendered the data unusable as a benchmark. PD II 66 at 14. And
Commerce successfully challenged the 1999 Colombian organic fertilizer study (4M) by citing the study's limited
sample size and equivocal treatment of exchange rates and taxes. *Id.* at 13. These flaws—in contrast with other
deficiencies like contemporaneity, which might be corrected with a price multiplier—call into question whether the
data actually represent cow manure prices in market economy countries. Commerce could reasonably rely on such
sound rationales.

Blue Field bore a *de facto* burden to show Commerce's data yielded a distorted price for rice straw. *See Peer Bearing*, 36 CIT at __, 884 F. Supp. 2d at 1331–32; *Longkou Haimeng Mach. Co.*, 32 CIT at 1164, 581 F. Supp. 2d at 1363. To meet this burden, Blue Field did little more than regurgitate the subheading from HTS 3101.00. This argument in itself generally would not prove the Colombian data were insufficiently specific and unsuitable for surrogate use.

Nevertheless, despite Blue Field's flawed attempt to demonstrate specificity problems in Commerce's data, the court holds Commerce must reconsider the specificity of its cow manure surrogate on remand. As discussed above, Blue Field offered evidence that Commerce's surrogate was aberrational. *See supra* Part III(C)(i). These aberrations may have resulted from specificity problems in the Colombian data (1M). Furthermore, although Commerce attempted to reject Blue Field's alternative cow manure surrogates, the court finds these arguments unconvincing. *See infra* Part III(C)(iii). It was improper for Commerce to use data of questionable reliability when Blue Field offered more specific alternative surrogates. *See Zhengzhou*, 33 CIT at 498, 617 F. Supp. 2d at 1321. Accordingly, Commerce's cow manure surrogate choice was not based in substantial evidence.

iii.     Commerce Failed to Explain Why Blue Field's Alternative Surrogates Were Inferior to the Colombian Data

Because Blue Field's data revealed possible specificity problems and aberrations in the Colombian surrogate, Commerce had to explain why it used the Colombian data and not Blue Field's alternatives. This it did not do.

Commerce rejected Blue Field's Indian manure surrogates because the surrogates came not from Colombia but from India, because India is supposedly neither economically comparable to China nor a significant mushroom producer, and because the Indian data were not

contemporaneous with the period of review. *See supra* Part III(B)(iii). Although India was not among the agency's listed surrogate countries, however, Commerce valued a number of products from places other than Colombia. *See* Preliminary Results, 77 Fed. Reg. at 13,267 (valuing mushroom spawn in Ukraine and land rent in the Philippines). Blue Field also provided data showing India is economically comparable to China and a significant mushroom producer. *See* PD II 19. In light of record data, the court concludes Commerce erred to reject the Indian data for no reason other than the data's country of origin. *See Clearon*, 2013 WL 646390, at *3–6.

Commerce also erred in dismissing the Indian data because of contemporaneity problems. While Commerce may invoke contemporaneity as a tie-breaking factor when choosing between equally reliable datasets, the agency should not dismiss alternative surrogates when its own surrogate appears flawed. *See Shakeproof*, 30 CIT at 1178–79. And Commerce might have fixed the contemporaneity problem by applying a multiplier. *See supra* Part III(B)(iii).

For these reasons, the court holds Commerce did not base its cow manure surrogate in substantial evidence. On remand, Commerce must reevaluate its surrogate choice in light of Blue Field's manure surrogates and benchmarks (2M–3M, 7M–8M). Commerce must also consider whether Monterey Mushrooms' benchmark data (9M) are reliable corroborants for cow manure prices. Finally, in light of this analysis, Commerce must reconsider whether its Colombian surrogate (1M) is the "best available information" on the record compared with Blue Field's alternative surrogates (2M–3M).

## IV.    CONCLUSION AND ORDER

The court concludes that Commerce did not base its surrogate values for rice straw and cow manure in substantial evidence. Accordingly, the court declines to address the parties' other

arguments. On remand, Commerce must reconsider its surrogate values for rice straw and cow

manure and recalculate Blue Field's dumping margin.

Upon consideration of all papers and proceedings herein, it is hereby:

**ORDERED** that the final determination of the International Trade Administration, United States Department of Commerce ("Commerce"), published as *Certain Preserved Mushrooms from the People's Republic of China*, 77 Fed. Reg. 55,808 (Dep't Commerce Sept. 12, 2012) ("Final Results"), be, and hereby is, REMANDED to Commerce for redetermination; it is further

**ORDERED** that Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record be, and hereby is, GRANTED as provided in this Opinion and Order; it is further

**ORDERED** that Commerce must issue a redetermination ("Remand Redetermination") in accordance with this Opinion and Order that is in all respects supported by substantial evidence, in accordance with law, and supported by adequate reasoning; it is further

**ORDERED** that Commerce, on remand, shall reconsider its decision to use the Colombian Global Trade Atlas ("GTA") data under Harmonized Tariff Schedule ("HTS") 1213.00 (1S) as a surrogate value for rice straw, and in doing so, must redetermine a surrogate based on the "best available information" on the record in accordance with 19 U.S.C. § 1677b(c)(1) (2006), as compared with alternative surrogates (2S–3S) and benchmarks (6S–10S) on the record; it is further

**ORDERED** that Commerce, on remand, shall reconsider its decision to use the Colombian GTA data under HTS 3101.00 (1M) as a surrogate value for cow manure, and in doing so, must redetermine a surrogate based on the "best available information" on the record in accordance with 19 U.S.C. § 1677b(c)(1), as compared with alternative surrogates (2M–3M) and benchmarks (7M–9M) in the record; it is further

**ORDERED** that Commerce shall recalculate Plaintiff Blue Field's dumping margin consistent with the surrogate values Commerce assigns to Blue Field's rice straw and cow manure inputs on remand; it is further

      **ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its Remand Redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff and Defendant-Intervenor shall have thirty (30) days from the filing of the Remand Redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff and Defendant-Intervenor's comments to file comments.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: November 14, 2013
New York, New York